In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-15-00350-CR
NO. 09-15-00351-CR

_____

**CHARLES LAROCCA MARINO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 13-10-10511-CR Counts II & III**

**MEMORANDUM OPINION**

Charles LaRocca Marino (Marino or appellant) appeals his convictions for one count of indecency with a child by sexual contact (Count II) and one count of sexual performance by a child (Count III).[1] *See* Tex. Penal Code Ann. §§ 21.11(a)(1), 43.25(b) (West 2011). Marino waived his right to a jury trial. After

---

[1] Appellant was also charged by indictment with another count of indecency with a child (Count I), but the State abandoned Count I and Marino was tried only on Counts II and III.

a bench trial, the trial court found Marino guilty on both Counts II and III, assessed Marino's punishment at imprisonment for seven years on each count, and granted the State's motion to cumulate the sentences. Marino timely appealed his convictions. In two appellate issues, Marino challenges the legal and factual sufficiency of the evidence supporting his convictions. We affirm the trial court's judgments as modified.

THE INDICTMENT

On October 1, 2013, the grand jury indicted Marino as to Counts II and III as follows:[2]

COUNT NO. 2

. . . on or about October 4, 2012 in Montgomery County, Texas, Charles LaRocca Marino, hereinafter styled Defendant, did then and there, with intent to arouse and gratify the sexual desire of the defendant, engage in sexual contact by touching the breast of [A.A.], with the defendant's hands, a child younger than 17 years of age[.]

COUNT NO. 3

. . . on or about October 04, 2012 in Montgomery County, Texas, Charles LaRocca Marino, hereinafter styled Defendant, did then and there intentionally or knowingly employ, authorize, and induce [A.A], a child younger than 18 years of age, to engage in sexual conduct, to-wit: mast[u]rbation in the presence of the

---

[2] We identify the victim by using initials. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims the "right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2

defendant, and the defendant knew the character and content of said sexual conduct or sexual performance[.]

Testimony of the Victim

A.A. testified that she was sixteen years old when she met Marino at a department store where they both were employed. Marino was fifty years old when they met. A.A. was attracted to Marino and confided in him about her past sexual abuse, as well as some "issues" with her family, and she told him that sometimes she would purposefully cut herself. A.A. testified she and Marino began spending time together outside of work, and that they became "something more[]" than friends in July of 2012. A.A. testified she did not have a relationship with her biological father and that the first time she went to get coffee with Marino she "told him some things about [her] dad . . . too much, and [she] ran out crying back to [her] car." A.A. testified that Marino took A.A. to dinner and hugged her, and although she felt attracted to him, she also "felt scared[]" and "weird[]" and almost cried. Then Marino kissed her on the shoulder and she "freaked out." Also, around the same time, Marino took her to a bookstore, he introduced her to a book called *Fifty Shades of Grey*, he showed her a contract that was in the book and Marino could tell that it aroused her. Marino wrote a contract modeled after the one in the book and presented it to A.A. The contract written by Marino stated, among other

things, that A.A. was to wear a collar that Marino would provide at all times to show that she was submissive to him, and that A.A. was to go to Marino's house once every two weeks to clean. According to A.A., parts of the contract, like having to wear the collar all the time and cleaning Marino's house, were not enforced by Marino, but she thought he had spanked her once with a ping pong paddle "for being late or something." A.A. also testified that the contract written by Marino explicitly stated there would be no sexual contact until A.A. was seventeen years old.[3]

A.A. testified that around this same time, they were in the car and she masturbated in front of him with her clothes still on "[b]ecause . . . he asked me to, so I did, and I wanted to[.]"According to A.A., Marino would take her out and buy her alcohol, and he would also bring alcohol back to his apartment where she could drink and sometimes get intoxicated. At first she went to his apartment two or three times a week but then it became "almost an every-night thing[.]" They purchased a bondage kit and on multiple occasions he would tie her to the couch. A.A. testified regarding her relationship with Marino and the details of being tied up and of Marino's behavior:

---

[3] A copy of the first contract does not appear in the record.

Q. Okay. You were in here when I read the indictment. There are three – I'm sure there were multiple times -- we have three charges here. One was him touching your genitals.

A. Yeah.

Q. It can be over the clothes, not under. The other was touching your breast, and the other one was asking you to masturbate, or to masturbate in his presence.
    Tell us about sometimes, if any, where he would touch the outside of your panties where your sexual organ is with his hands.

A. There was one night in particular that I somehow remember after that much alcohol, I undressed, and it was after we had purchased the bondage kit. And he tied me to the couch, and I was on the floor. And this was probably the fifth time that he had tied me to the couch. And I was in nothing but bra and panties. And his hands went over my body and he dry-humped me.

        .   .   .   .

Q. So he -- one time you're tied up on the couch, would he touch your breast?

A. Yeah.

Q. And would he touch you on the outside of your panties as well?

A. Yeah.

As to the touching of her breasts, A.A. also stated "I honestly [thought] it was an accident. . . . Not that he didn't mean to, it's just that we were both so drunk. He said, oh, crap, and stopped." A.A. testified that on other occasions at his apartment he would buy her alcohol and ask her to masturbate in front of him, and

5

she explained he asked her to do so. According to A.A., Marino did not coerce her or threaten her, and he never forced her to do anything. A.A. testified she was still sixteen years old on all of these occasions, that she voluntarily did these things with Marino, and that she wanted to have a sexual relationship with Marino.

A.A. explained that in July of 2012 she met another adult male who was "closer to [her] age[.]" According to A.A., Marino became angry about A.A.'s relationship with the other man and "started criticizing [A.A.] for ending what [she] had with [Marino,]" which made A.A. cry, and she cut herself. Ultimately, A.A. agreed to "go back on the contract again[]" with Marino, but she said she did so "not knowing what [she] was getting [herself] into[.]" On October 4, 2012, Marino presented A.A. with a second contract that Marino drafted, and it was similar in all respects to the first, but it included a monogamy clause. Both Marino and A.A. signed the contract "[a]fter a lot of arguing[.]" A.A. testified that around the time that Marino presented her with the second contract, Marino also hinted to A.A. that he was going to call the police about A.A.'s relationship with the other adult male. Although A.A. testified that she signed the first and second contracts of "[her] own freewill[,]" she acknowledged that she felt "a little pressure[d]" to sign the second contract and signed it "to appease" Marino. A.A. explained that she and Marino began arguing often about the other adult male. According to A.A., she

6

would tell Marino not to argue with her so much and not to threaten or hate the other adult male with whom A.A. was involved because she "couldn't handle any more pressure from anything." A.A. testified that on October 27, 2012, after leaving Marino's apartment, she attempted suicide by stabbing herself in the stomach.

At trial, A.A. agreed with the statement that her relationship with Marino "was a friendship, it was a romantic relationship, and actually had some father-figure aspects to it[.]" A.A. testified that she felt safe with Marino, that "he was the person that [she] went to for everything," that "he was [her] best friend, and it was also partially a daddy issue thing." She acknowledged at trial that Marino was good at mind games and that, in her relationship with Marino, Marino was the "dominant," the one with the control and power, and that she was the "submissive," the one who would cater to the dominant's control. She described Marino as "very emotional[]" and testified that when he gets upset he does not get physical but that "it's hard for him to come back unless you do exactly what he wants."

Testimony of Detective Mullis

Detective Mullis with the Montgomery County Sheriff's Office, Major Crimes Division, testified that he became involved in the case when he responded

7

to an "attempted suicide call." At that time, A.A. had already been transported to the hospital. According to Mullis, there were two 911 calls, one from Marino, who reported that someone needed to check on A.A., and the other call was from A.A.'s parents. While investigating the scene, Mullis and another officer discovered a "dom/sub contract" in A.A.'s purse with A.A.'s and Marino's signatures on it. Mullis testified that when law enforcement first interviewed Marino regarding A.A., Marino "knew a lot of small details about [A.A.]'s life[,]" but Marino denied having an intimate or romantic relationship with A.A. Based on information from the contract, Detective Mullis obtained a warrant to search Marino's apartment. Detective Mullis collected a bottle of vodka, rope, a bondage kit, a collar, a ping pong paddle, and other items from Marino's apartment.

Testimony of Marino

Marino testified that he and A.A. became good friends in April 2012, after they started talking in the department store where they were both employed. He knew she was under the age of seventeen but "felt [they] could still be friends." They began having coffee together in July 2012, and at the end of July or the beginning of August, he let A.A. know he had a romantic interest in her and he kissed her shoulder. Marino testified that he "felt protective of [A.A.]. . . . felt like a father figure, . . . felt like a friend, and . . . felt attracted to [A.A]." Marino

8

explained at trial that he initially took A.A. to a restaurant, they both drank wine and martinis, and he hugged and kissed her. According to Marino, A.A. talked to him about her "sexual past[,]" and she made it clear to him that "she was into BDSM."

Marino testified that one day he was in a bookstore and saw the contract in the *Fifty Shades of Grey* book and showed it to A.A. He asked her if that would "be something that [she would] be interested in[,]" and according to Marino, A.A. enthusiastically said "yes[.]" Marino drafted a written contract which, according to him, made it clear that they would have no sexual contact because A.A. was not old enough, and the contract was to expire three months later, the day before A.A.'s seventeenth birthday. Marino testified that he presented A.A. with the first contract on August 4, 2012. Marino testified he did not give A.A. anything for signing the contract and she signed it under her own free will.

Marino's testimony was similar to A.A.'s testimony regarding him buying her alcohol to drink at his apartment, the instances of bondage and sexual activities, and the arguments between A.A. and Marino. He admitted giving A.A. "two swats" on the "behind[]" on two occasions as punishment for arriving late. He testified that A.A. only masturbated in his apartment: once in August and once in October. He testified that A.A. was "[q]uite possibly[]" intoxicated when she

9

masturbated with her clothes on in August, but that he did not tell her to do it or give her anything. According to Marino, A.A. is "mistaken[]" if she recalls that Marino told her to do so. Marino testified that A.A. was the one who wanted to "rush the sexual relationship." Marino explained that he was careful never to touch her breast or female genitalia and that "[i]f [he] touched her breast, [he] might have elbowed her while passing her in the kitchen, but that's the only time [he had] ever touched her breast."

According to Marino, in August, A.A. became involved with another man and she broke up with Marino. Marino recalled screaming at A.A. on the telephone near the latter part of September, because he was heartbroken and angry. At some point, A.A. told Marino she would do whatever Marino wanted and "go back on the contract[]" and Marino then drafted a second contract that was similar to the first, except it stated their relationship would be monogamous. Marino and A.A. signed the second agreement October 4, 2012. Marino testified that later, when A.A. threatened to kill herself, he called 911. Marino explained that he did not tell the officers about his relationship with A.A. when they interviewed him because it was "none of their business."

The October Contract

State's Exhibit 51 was admitted into evidence without objection. The document is a typewritten two page document, entitled "Second Probationary DOM/sub Contract[.]" The document includes ten numbered paragraphs. The document is signed by Marino and A.A., and is dated October 4, 2012. The document provides that, among other things, A.A. is "[t]he submissive" and Marino is "[t]he Dominant[,]" the submissive is required to wear a choker as a "sign of her fealty to the Dominant[,]" the submissive must address the Dominant by his first name or as "sir[,]" and Dominant will address submissive "in any fashion that pleases him[,]" Dominant will administer "discipline" to the submissive "in the form of 'swats' with a table-tennis paddle[,]" and Dominant will reward submissive once the submissive has fulfilled her "obligations" under the contract by purchasing an article of clothing of the submissive's choice from any store in the Mall.

ISSUES ON APPEAL

Marino raises two issues on appeal. In his first appellate issue, Marino challenges the legal and factual sufficiency of the evidence supporting his conviction as to Count III of the indictment. Specifically, he contends the evidence presented was insufficient to prove that he employed, authorized, or induced A.A.

11

to engage in sexual performance. In his second appellate issue, Marino challenges the legal and factual sufficiency of the evidence supporting his conviction as to Count II of the indictment. Specifically, he argues that the evidence is insufficient to prove that he intentionally contacted A.A.'s breast to gratify his sexual desire.

## STANDARD OF REVIEW

We review a challenge to the sufficiency of the evidence in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010). In a bench trial, the trial judge is the sole trier of fact and judge of the credibility of the witnesses, and the trial court may choose to believe or not to believe some or all of the witnesses who testify at trial. *See Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Crim. App. 1978).

Given the standard of review that applies to sufficiency challenges, our role as an appellate court does not allow us to reweigh the weight of the evidence or the credibility of the various witnesses, and generally, we are not allowed to substitute our judgment for the factfinder's. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Inconsistencies in the evidence are resolved in a manner that

favors the factfinder's verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

SUFFICIENCY OF THE EVIDENCE AS TO COUNT III

A person commits the offense of sexual performance by a child "if, knowing the character and content thereof, he employs, authorizes, or induces a child younger than 18 years of age to engage in sexual conduct or a sexual performance." Tex. Penal Code Ann. § 43.25(b). In this statutory provision, the phrase "'[s]exual conduct' means sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." *Id.* § 43.25(a)(2). The phrase "'[s]exual performance' means any performance or part thereof that includes sexual conduct by a child younger than 18 years of age." *Id.* § 43.25(a)(1).

At trial, the trial court stated on the record that the appropriate consideration in this case was not whether Marino "employed" or "authorized" A.A. to engage in sexual performance, but whether Marino "induced" A.A. to engage in sexual conduct or a sexual performance. While the term "induce" is not defined by the Penal Code, courts have interpreted the term using its commonly understood meaning of "to move and lead by persuasion or influence[]" or "to persuade,

prevail upon, or bring about." *See Bell v. State*, 326 S.W.3d 716, 720 (Tex. App.—Dallas 2010, pet. ref'd, untimely filed); *Dorval v. State*, No. 03-03-00570-CR, 2004 Tex. App. LEXIS 6813, at *2 (Tex. App.—Austin July 29, 2004, no pet.) (mem. op., not designated for publication), *cert. denied*, 136 S. Ct. 41 (2015); *see also Schaefer v. State*, No. 03-11-00345-CR, 2014 Tex. App. LEXIS 7408, at *10 (Tex. App.—Austin July 10, 2014, pet. ref'd) (mem. op., not designated for publication) (adopting common definition of "induce," which is "to move by persuasion or influence" or "to bring about by influence"); *Baker v. State*, No. 10-11-00449-CR, 2012 Tex. App. LEXIS 9345, at **30-31 (Tex. App.—Waco Nov. 8, 2012, no pet.) (mem. op., not designated for publication) (same); *Dornbusch v. State*, 156 S.W.3d 859, 866-67 (Tex. App.—Corpus Christi 2005, pet. ref'd) (same). There is no requirement—either in the statute or the common understanding of the word—that the inducement must be verbal and explicit or that the defendant use force. *Dornbusch*, 156 S.W.3d at 867.

On appeal, Marino specifically argues that there is insufficient evidence that Marino directly induced A.A. to masturbate while in Marino's presence. In support of this argument, Marino relies on the court of appeals' opinion in *Scott v. State*, 173 S.W.3d 856 (Tex. App.—Texarkana 2005), *rev'd in part on other grounds*, 235 S.W.3d 255 (Tex. Crim. App. 2007). In *Scott*, Scott hired three teenage boys to

14

do chores around his house such as yard work, painting, and bathing his dogs. 173 S.W.3d at 858. Sometimes after the boys completed their work, Scott suggested they shower at his house, and Scott routinely offered to take the boys to dinner and a movie after they completed their work if they got "cleaned up" at his house. *Id.* at 859. After the boys discovered questionable photographs on Scott's computer, they reported the photographs to the authorities and the authorities obtained a search warrant. The search of Scott's house yielded child pornography and revealed that Scott had been secretly videotaping the boys in the shower through the use of a hidden camera. *Id.* Each boy testified at trial and admitted to masturbating while in the shower at Scott's house; and, each boy made it clear that Scott never offered them money to do so, nor did Scott encourage, threaten, or coerce them to do so. *Id.* The boys testified that they did not know about the videotaping and that it was done without their consent. *Id.* at 860.

The Texarkana Court of Appeals noted that the fact Scott induced the boys to take showers did not violate the statute because the specific conduct induced must satisfy the sexual conduct element of the statute, and "when looking at whether the facts of any given case constitute 'inducement' in its ordinary meaning, the focus must be on what, if anything, Scott did to bring about, persuade, or encourage the boys' masturbation." *Id.* at 863-64. The Texarkana

Court of Appeals held that, although Scott clearly "wronged" the boys, the evidence was insufficient to support Scott's conviction for inducement of sexual performance or sexual conduct as contemplated by section 43.25(b) because Scott did not directly induce them to masturbate and they were not aware they were being observed or videotaped. *Id.* at 864.

Marino argues on appeal that as in *Scott*, "there is no evidence that supports the factual finding that the actions of [Marino] were a direct inducement to the sexual act complained of[]" because the only evidence of direct inducement by Marino is A.A.'s agreement at trial that Marino "didn't coerce [her] or threaten [her] and say masturbate or else[.]"

*Scott* is clearly distinguishable from the present case. In *Scott*, there was no evidence that the defendant ever asked the boys to masturbate in the shower, and the boys testified they did not know they were being watched or videotaped. In Marino's case, the trial court heard testimony from A.A. and Marino that Marino was a "father-figure" to sixteen-year-old A.A., he held a place of authority over her, he drafted and presented dominant-submissive contracts to her, and he was the "dominant" under the contracts and she was the "submissive[.]" The trial court also heard A.A.'s testimony that she felt "scared" and "weird" the first time Marino hugged her, that Marino would tie her to his couch in her bra and panties on

16

multiple occasions, that he had "punished" her pursuant to the contract by spanking her with a ping pong paddle, that he had threatened to report A.A.'s relationship with another adult male to the police, that Marino would buy A.A. alcohol and she would become intoxicated, and that Marino asked her to masturbate in front of him. Based on this record and viewing the evidence in the light most favorable to the verdict, we conclude that a rational finder of fact could have found, beyond a reasonable doubt, that Marino induced A.A. to engage in sexual conduct as alleged in the indictment. The evidence is sufficient to support the conviction on Count III. Issue one is overruled.

SUFFICIENCY OF THE EVIDENCE AS TO COUNT II

A person commits the offense of indecency with a child if, with a child younger than seventeen years of age, a person engages in sexual contact with the child or causes the child to engage in sexual contact. Tex. Penal Code Ann. §21.11(a)(1). "Sexual contact" includes any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child, done with the intent to arouse or gratify the sexual desire of any person. *Id.* § 21.11(c)(1). "[T]he requisite specific intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks and all surrounding circumstances." *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim.

17

App. 1981). However, if the touching is accidental, it cannot be said that it was done with the intent to arouse or gratify the sexual desire of any person. *See Means v. State*, 955 S.W.2d 686, 691 (Tex. App.—Amarillo 1997, pet. ref'd, untimely filed).

Marino argues on appeal that the record shows "that his hands did not touch [A.A.'s] breast over or under the clothing . . . with the single exception of one accidental touching[,]" and that there is no evidence that he touched A.A.'s breast to gratify his sexual desires. In support, Marino references A.A.'s testimony that Marino had touched her breast once by accident.

A.A.'s testimony regarding the touching of her breast included her statement that: "I honestly [thought] it was an accident. . . . Not that he didn't mean to, it's just that we were both so drunk. He said, oh, crap, and stopped." The trial court could have reasonably determined that this statement supports the charges made against Marino and even contradicts Marino's argument that he never touched A.A.'s breast. Additionally, in light of all of the evidence before the trial court, and given that the trial court was the sole judge of the credibility of the witnesses, and that as the factfinder the judge was free to disbelieve or believe some, all, or none of the witnesses testimony, the trial court could have reasonably concluded the touching of A.A.'s breast was not "accidental." *See Sharp v. State*, 707 S.W.2d

611, 614 (Tex. Crim. App. 1986) (the factfinder at trial may choose to believe or disbelieve the witnesses); *Langley v. State*, No. 12-14-00095-CR, 2015 Tex. App. LEXIS 5120, at **11-12 (Tex. App.—Tyler May 20, 2015, no pet.) (mem. op., not designated for publication) (evidence in a bench trial sufficient to show appellant touched the victim to gratify appellant's sexual desire where the trial court was free to disbelieve witness's and appellant's testimony that the touching of the victim was an accident and that appellant's admission to having a "sexual thought" supported inference that the touching was done with intent to gratify appellant's sexual desire); *see also Balsley v. State*, No. 01-10-00560-CR, 2012 Tex. App. LEXIS 6031, at **16-18 (Tex. App.—Houston [1st Dist.] July 26, 2012, no pet.) (mem. op., not designated for publication) (evidence of appellant's conduct, his remarks, and all surrounding circumstances was sufficient to establish appellant touched the victim with the intent to arouse or gratify the sexual desire of any person, even though he contended he touched complainant's bare breast during accidental horseplay).

Furthermore, the testimony by A.A. and Marino regarding the sexual nature of the contracts they entered into, as well as A.A.'s testimony that the touching occurred during sexual activities, supports the inference that the touching was done with the intent to arouse or gratify Marino's sexual desire. After viewing the

19

evidence in the light most favorable to the verdict, we conclude that the trial court could reasonably conclude beyond a reasonable doubt that the touching was not accidental and the evidence was sufficient to show that Marino engaged in sexual contact with the child or caused the child to engage in sexual contact as alleged in the indictment, and that Marino did so with the intent to gratify his sexual desire. *See Brooks*, 323 S.W.3d at 895; *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.— Texarkana 2006, pet. ref'd). Accordingly, we overrule Marino's second issue.

CONCLUSION

We note that the trial court's final judgment for Count II incorrectly states "JUDGMENT OF CONVICTION BY JURY" and "Verdict of Jury: GUILTY[,]" and that the trial court's final judgment for Count III incorrectly states "JUDGMENT OF CONVICTION BY JURY" and "Verdict of Jury: GUILTY." This Court has authority to modify the trial court's judgment to correct clerical errors. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 531 (Tex. App.—Dallas 1991, pet. ref'd). We delete that portion of the judgments for Counts II and III stating "JUDGMENT OF CONVICTION BY JURY" and substitute "JUDGMENT OF CONVICTION BY COURT—WAIVER OF JURY TRIAL[.]" We delete that

20

portion of the judgments stating "Verdict of Jury[]" and substitute "Verdict of Court[.]"

Having overruled appellant's issues, we affirm the trial court's judgments as modified.

AFFIRMED AS MODIFIED.

_____
LEANNE JOHNSON
Justice

Submitted on July 14, 2016
Opinion Delivered August 24, 2016
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.